T.C. Memo. 2009-183

UNITED STATES TAX COURT

STEPHEN E. O'NEIL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17460-07L.                 Filed August 11, 2009.

<u>Kevin M. Flynn</u>, for petitioner.

<u>Shawna A. Early</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Pursuant to section 6330(d),[1] petitioner seeks review of respondent's determination to proceed with collection of his unpaid 1980, 1981, 1993, 1996, 1997, 2002, 2003, and 2004 income tax liabilities.  The issue for decision is

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code.

whether respondent may proceed with collection of the above-mentioned unpaid income tax liabilities.  We must decide whether petitioner submitted an offer-in-compromise (OIC) to respondent during the collection hearing.

                        FINDINGS OF FACT

     Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.  At the time he filed the petition, petitioner resided in New York.

Background

     In 1954 petitioner graduated Phi Beta Kappa from Princeton University.  In 1957 petitioner graduated from Harvard Law School.  After law school, petitioner was employed by the law firm of Cravath, Swaine & Moore, L.L.P.

     In 1978 petitioner became a member of the board of directors of Brown Forman Corp. (Brown Forman).  Petitioner served as a member of the board of directors of Brown Forman from 1978 until April of 2007.

     As part of his role as a director of Brown Forman, petitioner was awarded Brown Forman stock options each July from 1997 through 2006.  Petitioner's right to exercise each Brown Forman option expires 10 years after the date of grant.  If petitioner fails to timely exercise an option, it lapses.  Each option granted petitioner the right to purchase a particular

number of shares of Brown Forman common stock.  Each option had a different exercise price based on the fair market value (i.e., the stock exchange trading price) of the stock on the date of the award.  Petitioner's per-share exercise prices for the Brown Forman stock options from 1997 through 2006 are as follows:

| Stock Option Award Year | Petitioner's Option Exercise Price |
|---|---|
| 1997 | $24.56 |
| 1998 | 30.63 |
| 1999 | 31.13 |
| 2000 | 25.22 |
| 2001 | 34.17 |
| 2002 | 32.11 |
| 2003 | 39.23 |
| 2004 | 46.58 |
| 2005 | 59.18 |
| 2006 | [1] 72.40 |

[1] Respondent notes that although Exhibit 23-J indicates that the exercise price for the 2006 options is $72.40 per share, there apparently is an error in this calculation.  The exercise price should be $63.87 per share ($148,565 (total option purchase price)/2,326 (number of shares) equals $63.87 option exercise price, not $72.40).

Petitioner is not required to pay cash up front in order to exercise the Brown Forman options.  Rather, petitioner can "net exercise" the options, receiving cash equal to the excess of the fair market value of the stock at the time of exercise over the option exercise price.

Collection Notices

On June 16, 2005, respondent sent petitioner a Notice of Federal Tax Lien Filing and Your Right to a Hearing under I.R.C. 6320 (lien notice) with respect to petitioner's outstanding income tax liabilities for the taxable years 1993, 1996, 1997, 2002, and 2003.

On July 1, 2005, respondent sent petitioner a Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing (levy notice) relating to petitioner's outstanding income tax liabilities for the taxable years 1993, 1996, 1997, 1998, 1999, 2000, 2001, 2002, and 2003.

On or about July 15, 2005, petitioner submitted to respondent a Form 12153, Request for a Collection Due Process Hearing, in response to the lien notice and the levy notice (hearing request). Respondent treated the hearing request as a timely request for a collection hearing for all the taxable years in both the lien notice and the levy notice with the exception of 1998, 1999, 2000, and 2001.[2]

On August 29, 2005, respondent sent petitioner a Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing relating to petitioner's outstanding income tax

---

[2] Petitioner was granted an equivalent hearing relating to taxable years 1998, 1999, 2000, and 2001 as he received prior lien and levy notices for those years and did not timely request a collection hearing.

- 5 -

liabilities for the taxable years 1980, 1981, and 2004 (second
levy notice).

On September 14, 2005, respondent received petitioner's Form
12153 for taxable years 1980, 1981, and 2004 relating to the
second levy notice.

With respect to taxable years 1993, 1996, 1997, 2002, and
2003, as of July 1, 2005, petitioner's outstanding income tax
liabilities were $265,060.77, $272,029.71, $151,259.14,
$48,769.89, and $51,518, respectively.  With respect to taxable
years 1980, 1981, and 2004, as of August 29, 2005, petitioner's
outstanding income tax liabilities were $6,234,617.69,
$3,880,264.45, and $8,826.11, respectively.[3]  Accordingly, as of
September 2005 petitioner's outstanding income tax liabilities
for the years at issue totaled approximately $11 million:

| Year | Amount |
| --- | --- |
| 1980 | $6,234,617.69 |
| 1981 | 3,880,264.45 |
| 1993 | 265,060.77 |
| 1996 | 272,029.71 |
| 1997 | 151,259.14 |
| 2002 | 48,769.89 |
| 2003 | 51,518.00 |
| 2004 | 8,826.11 |
| Total | 10,912,345.76 |

Petitioner did not challenge the amount of his underlying tax
liabilities during the collection hearing.

_____

[3]  The tax liabilities relating to 1980 and 1981 stemmed
from petitioner's involvement in tax shelters.

Petitioner's Desire To Enter Into an Offer-in-Compromise

From the time that petitioner received the collection notices from respondent, it was petitioner's intention to resolve his tax liabilities at issue through an OIC. In 2005 petitioner was generally familiar with OICs, and he believed that an OIC was the only way for him to satisfy the liabilities at issue.

On December 8, 2005, petitioner submitted to respondent a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals. Petitioner reported that his gross monthly income was $10,337. Petitioner claimed monthly living expenses of $8,635.

On the Form 433-A petitioner listed 25,275 options in Brown Forman stock as an investment. Form 433-A requests the current value (the amount the asset could be sold for that day) of the investments listed. Petitioner did not list the current value of the Brown Forman options. Instead, petitioner stated that "The value of the options is indeterminate because their value is contingent upon the market price of the underlying stock which fluctuates daily."

On March 22, 2006, a face-to-face collection hearing was held between petitioner's counsel and Settlement Officer Robert J. Fernandez (SO Fernandez). During the face-to-face hearing the parties first discussed petitioner's desire to submit an OIC, and

petitioner's counsel indicated that petitioner was willing to exercise his Brown Forman stock options to fund an OIC.

After the March 22, 2006, face-to-face collection hearing, petitioner's counsel and SO Fernandez continued the collection hearing via telephone and correspondence. SO Fernandez requested documents and information from petitioner to determine whether petitioner was eligible to submit an OIC (e.g., proof that petitioner was current with his filing and payment requirements).

By a letter dated April 13, 2006, petitioner's counsel sent information to SO Fernandez in response to his requests, including copies of (1) petitioner's Form 1040, U.S. Individual Income Tax Return, for 2004; (2) canceled checks in payment of petitioner's Federal, State and local estimated taxes for 2005; and (3) a letter from Brown Forman confirming that petitioner's position as a director of the company would end on April 30, 2007.

On July 14, 2006, petitioner's counsel sent SO Fernandez a letter which contained, inter alia, a detailed discussion of the grant, terms, and operation of petitioner's Brown Forman stock options. Petitioner was heavily involved in the preparation of the July 14, 2006, letter. The letter proposed exercising some of the options to fund an OIC.

In the July 14, 2006, letter, petitioner proposed to exercise his Brown Forman options for years 1997 through 2003.

The closing price of Brown Forman stock on July 13, 2006 (the day before the letter), was approximately $70 per share.[4] Using a price of $70 per share, petitioner calculated that the exercise of these options would result in ordinary income of approximately $776,500. Petitioner estimated that he would owe Federal income taxes of $271,775 and State and local income taxes of $93,180 on this income. Thus, petitioner determined that the net proceeds from the exercise of the options for 1997 through 2003, after all taxes were paid, would be approximately $412,000.

In the July 14, 2006, letter, petitioner suggested that he pay respondent $125,000 from the exercise of the Brown Forman options for 1997 through 2003 in order to settle his outstanding $11 million debt. Further, petitioner stated that respondent should accept this amount to account for the fact that

> (i) the Options are nothing more than a potential asset that are valueless to both Mr. O'Neil and the IRS if he does not exercise them; (ii) the Options are not marketable and can be only exercised by Mr. O'Neil; further, the Options cannot be seized, sold, pledged or hypothecated; (iii) the value of the Options in the future is wholly unknown and unknowable; the price of the [Brown Forman stock] could go down in the years to come, thereby rendering it uneconomical for Mr. O'Neil to exercise the Options; and (iv) the receipt of tax dollars today from the exercise of the Options has a present value to the IRS.

---

[4] At the time the collection hearing was conducted, and as of the date of trial, the fair market value for the Brown Forman stock still was approximately $70 per share.

Petitioner, rather than his counsel, established the figure of $125,000. However, petitioner was willing to negotiate this figure with respondent and pay a greater amount in order to reach an agreement on an OIC.

The July 14, 2006, letter was signed by petitioner's counsel, not petitioner. This letter was not signed under penalties of perjury and was not accompanied by a $150 check for the application fee.

While petitioner and SO Fernandez were discussing a possible OIC, Congress enacted the Tax Increase Prevention and Reconciliation Act of 2005, Pub. L. 109-222, sec. 509(a) and (d), 120 Stat. 362, 364 (2006), which amended section 7122 by adding a new subsection (c) requiring a 20-percent downpayment for a lump-sum OIC made on or after July 16, 2006.

As of December 7, 2006, petitioner had not filed an OIC. That same day petitioner's counsel informed SO Fernandez that he would "check his records to be sure, but he feels he did not send [an OIC] in." SO Fernandez indicated that because petitioner had not yet submitted an OIC, petitioner would be required to include a 20-percent deposit with an OIC.

On March 8 and 13, 2007, SO Fernandez informed petitioner's counsel that a 20-percent deposit was required for all OICs under the new section 7122(c)(1)(A)(i). SO Fernandez requested that

petitioner provide him with a copy of one of the Brown Forman option agreements.

On March 23, 2007, petitioner's counsel informed SO Fernandez that petitioner was willing to make a payment of $25,000--i.e., 20 percent of $125,000 (petitioner's estimate of an acceptable OIC).  Petitioner's counsel also sent SO Fernandez a copy of the Brown Forman "Non-Employee Director's Nonqualified Stock Option Award" granted to petitioner on July 22, 2004.  All of the Brown Forman options that had been awarded to petitioner were substantially similar in form to the 2004 option except for the grant dates, expiration dates, number of shares, and the prices per share, which varied.  These options could not be sold, transferred, pledged, assigned, or otherwise hypothecated.

On May 9, 2007, SO Fernandez acknowledged receipt of the 2004 option agreement and requested that petitioner provide SO Fernandez by May 31, 2007, with a schedule of all of the options that petitioner was awarded for 1997 through 2006.  SO Fernandez requested that the schedule include the number of shares and the exercise price (price per share) covered by each option contract. SO Fernandez stated in this letter that a schedule of the options, rather than the individual option contracts, was sufficient for him to evaluate the merits of petitioner's proposed OIC.

On May 10, 2007, petitioner's counsel sent SO Fernandez the requested schedule of petitioner's Brown Forman options. The schedule included, inter alia, the number of shares per option award and the exercise price (price per share).[5]

After reviewing the schedule of options, SO Fernandez's preliminary finding was that petitioner's net realized equity (NRE) in all of petitioner's Brown Forman options was $617,524. He found that the 25,275 Brown Forman shares for which petitioner had options had a fair market value of $1,769,250, using the $70-per-share fair market value petitioner's counsel asserted in the July 14, 2006, letter. In reaching the NRE, SO Fernandez calculated that petitioner's cost of exercising the options (the exercise price times the number of shares) would be $680,331 and subtracted that amount from the $1,769,250 fair market value of the Brown Forman stock. In reaching his NRE amount, SO Fernandez also deducted petitioner's estimated Federal, State, and local taxes of $471,395 from the $1,769,250 fair market value of the Brown Forman stock. SO Fernandez found no legal authority or administrative guidance to support petitioner's counsel's argument that the NRE should be discounted.

---

[5] This schedule lists a total of 27,601 options. However, the parties consistently referred to there being 25,275 options (with the exception of the stipulation of facts, where the total of 25,274 appears to be a typo). For convenience, we presume that petitioner had the option to purchase 25,275 shares of Brown Forman stock at the time of the collection proceedings.

On May 22, 2007, SO Fernandez told petitioner's counsel that he could find no basis under the Internal Revenue Manual (IRM) for reducing the NRE of the options below $617,524.

On June 8, 2007, SO Fernandez called petitioner's counsel and left a voice mail message, the substance of which SO Fernandez recounted in his activity records as follows: "Called the rep. and left a voice mail message on his voice mail to the effect that I did not believe that an offer could succeed if the taxpayer did not offer his complete equity minus the tax consequences. I mentioned that I had discussed this concept with the ATM [Appeals Team Manager]."

On June 18, 2007, SO Fernandez spoke with petitioner's counsel, the substance of which SO Fernandez recounted in his activity records as follows: "Rep. called and I finally spoke to him in person. He agreed that there is no support in the IRM for reducing the value of the options outside of the tax consequences". SO Fernandez advised petitioner's counsel that petitioner had sufficient income to meet his monthly expenses and that he could liquidate the Brown Forman options and make payments to reduce his balance.

Throughout the 15 months when petitioner's case was assigned to SO Fernandez, petitioner's counsel and SO Fernandez had several serious, focused, and meaningful discussions regarding petitioner's desire to enter into an OIC and how petitioner

proposed to fund one. Petitioner's intention to submit an OIC for the years at issue was the only collection alternative discussed by petitioner's counsel and SO Fernandez at the March 22, 2006, face-to-face collection hearing and in the 15 months thereafter (i.e., during the collection hearing) until the notice of determination was issued.

Petitioner understood and agreed that, if and when required, he would need to pay a $150 processing fee and submit a Form 656, Offer in Compromise. He did neither, nor did he submit a 20-percent nonrefundable deposit. Petitioner considered the Form 656, the 20-percent deposit, and the $150 processing fee to be ministerial aspects (procedural formalities) of an OIC that could be addressed if and when petitioner and respondent reached an agreement as to the amount of the OIC.

Notice of Determination

On or about July 5, 2007, SO Fernandez issued the notice of determination to petitioner, stating his position that the NRE of the options was $617,524. The notice of determination further stated in relevant part:

> The Internal Revenue Manual provides no support for reducing the value of an asset of this type merely because of the inherent difficulty in collection from it. The starting point for determining whether an offer can be accepted is the taxpayer's net equity in all of the assets. There is no provision for taxpayers to retain part of their equity outside of an Effective Tax Administration offer. The facts and circumstances in this case would not justify an offer under Effective Tax Administration. Therefore, in order for an offer

to be seriously considered, the net equity in the options must be the starting point.

Under the heading of "Collection Alternatives Offered by Taxpayer" the notice of determination also stated: "You expressed a desire to offer $125,000, but you have not formally submitted an offer."

                    OPINION

Section 6320(a)(1) provides that the Secretary shall furnish the person described in section 6321 with written notice (i.e., the hearing notice) of the filing of a notice of lien under section 6323. Section 6320(a) and (b) further provides that the taxpayer may request administrative review of the matter (in the form of a hearing) within a 30-day period. The hearing generally shall be conducted in a manner consistent with the procedures set forth in section 6330(c), (d), and (e). Sec. 6320(c).

Section 6330(a) provides that the Secretary shall furnish taxpayers with written notice of their right to a hearing before any property is levied upon. Section 6330 further provides that the taxpayer may request administrative review of the matter (in the form of a hearing) within a 30-day period. Sec. 6330(a) and (b).

Pursuant to section 6330(c)(2)(A), a taxpayer may raise at the section 6330 hearing any relevant issue with regard to the Commissioner's collection activities, including spousal defenses, challenges to the appropriateness of the Commissioner's intended

collection action, and alternative means of collection.  Sego v. Commissioner, 114 T.C. 604, 609 (2000); Goza v. Commissioner, 114 T.C. 176, 180 (2000).  Where the validity of the underlying tax liability is not at issue, we review the Commissioner's determination for abuse of discretion.  Sego v. Commissioner, supra at 610.

An OIC was the only issue petitioner's counsel and SO Fernandez discussed during the collection hearing.  Accordingly, the crux of this case is whether petitioner submitted an OIC to respondent during the collection hearing.  To decide this we look to the relevant statute and regulations.

Section 7122(a) authorizes the Commissioner to compromise a taxpayer's outstanding liabilities.  The regulations and procedures under section 7122 provide the exclusive method of effecting a binding nonjudicial compromise.  Laurins v. Commissioner, 889 F.2d 910, 912 (9th Cir. 1989), affg. Norman v. Commissioner, T.C. Memo. 1987-265; Shumaker v. Commissioner, 648 F.2d 1198, 1199-1200 (9th Cir. 1981) (citing Botany Worsted Mills v. United States, 278 U.S. 282, 288-289 (1929)), affg. in part, revg. in part and remanding per curiam on other grounds T.C. Memo. 1979-71.

Section 301.7122-1(d), Proced. & Admin. Regs., provides:

An offer to compromise a tax liability pursuant to section 7122 must be submitted according to the procedures, and in the form and manner, prescribed by the Secretary.  An offer to compromise a tax liability

> must be made in writing, must be signed by the taxpayer under penalty of perjury, and must contain all of the information prescribed or requested by the Secretary. * * *

See Nash v. Commissioner, T.C. Memo. 2008-250; Harbaugh v. Commissioner, T.C. Memo. 2003-316; see also Wagner v. Commissioner, T.C. Memo. 1990-443 ("compromise agreements under section 7122 are required to be in writing"); Prakash v. Commissioner, T.C. Memo. 1990-106 (same); Foulds v. Commissioner, T.C. Memo. 1989-29 (same).

An OIC must be submitted on a special form prescribed by the Secretary. Riederich v. Commissioner, 985 F.2d 574 (9th Cir. 1993), affg. without published opinion T.C. Memo. 1991-164; Laurins v. Commissioner, supra at 912. Section 601.203(b), Statement of Procedural Rules, identifies Form 656 as the form required for an OIC:

> Offers in compromise are required to be submitted on Form 656, properly executed, and accompanied by a financial statement on Form 433 (if based on inability to pay). Form 656 is used in all cases regardless of whether the amount of the offer is tendered in full at the time the offer is filed or the amount of the offer is to be paid by deferred payment or payments. * * *

See also Godwin v. Commissioner, T.C. Memo. 2003-289 ("Taxpayers who wish to propose an offer in compromise must submit a Form 656, Offer in Compromise"), affd. 132 Fed. Appx. 785 (11th Cir. 2005); Ringgold v. Commissioner, T.C. Memo. 2003-199 ("settlement of tax liabilities for less than the amount owed requires the completion of Form 656").

Petitioner did not submit a Form 656 or any other writing made under penalties of perjury to compromise his tax liabilities. Furthermore, petitioner admitted that he did not submit the 20-percent downpayment required by section 7122(c)(1)(A)(i). As petitioner's counsel stated, SO Fernandez and petitioner's counsel were discussing, considering, evaluating, and negotiating an OIC. Petitioner's counsel further stated that once an amount was agreed to, if it was agreed to, the "formalities" would have been accomplished. This never happened, and the "formalities" of submitting an OIC were never accomplished.

As petitioner did not submit a written OIC to respondent, we cannot find that a valid compromise was made. See Harbaugh v. Commissioner, supra; Ringgold v. Commissioner, supra ("petitioners did not submit an offer in compromise on the appropriate form (i.e., Form 656)"). Administrative negotiations regarding compromise of a tax liability are not binding against either party and not enforceable without compliance with section 7122. Rohn v. Commissioner, T.C. Memo. 1994-244.

Petitioner's intention to submit an OIC for the years at issue was the only collection alternative proposed by petitioner and discussed by petitioner's counsel and SO Fernandez at the conference on March 22, 2006, and in the 15 months thereafter (i.e., during the collection hearing) until the notice of

determination was issued.  Accordingly, the settlement officer
did not abuse his discretion in failing to consider an OIC that
petitioner never made.[6]  See Kindred v. Commissioner, 454 F.3d

_____

[6]  First, we note that SO Fernandez was not obligated to
propose a counteroffer.  See Fargo v. Commissioner, 447 F.3d 706,
712-713 (9th Cir. 2006), affg. T.C. Memo. 2004-13.  Second,
assuming arguendo that petitioner had submitted an OIC for
$125,000 on Form 656 and the 20-percent downpayment, it would not
have been an abuse of discretion for the settlement officer to
reject such an OIC.

We do not conduct an independent review of what would be an
acceptable OIC.  Murphy v. Commissioner, 125 T.C. 301, 320
(2005), affd. 469 F.3d 27 (1st Cir. 2006).  Instead, the extent
of the Court's review is to determine whether the decision to
reject the OIC was arbitrary, capricious, or without sound basis
in fact or law.  Id. at 308; see Woodral v. Commissioner, 112
T.C. 19, 23 (1999).

Regulations implementing sec. 7122 set forth three grounds
for the compromise of a liability:  (1) Doubt as to liability,
(2) doubt as to collectibility; and (3) promotion of effective
tax administration.  The validity of the underlying tax liability
is not at issue; accordingly, petitioner could not have sought an
OIC for doubt as to liability.  Petitioner could not pay his
liability in full; accordingly, petitioner could not have sought
an OIC to promote effective tax administration.  See sec.
301.7122-1(b)(3), Proced. & Admin. Regs.

Generally, an OIC based on doubt as to collectibility will
be acceptable only if the offer reflects the reasonable
collection potential (RCP).  Murphy v. Commissioner, supra at
309.  A taxpayer's RCP is calculated by adding together the
taxpayer's NRE and future income.  Lemann v. Commissioner, T.C.
Memo. 2006-37.

SO Fernandez computed that petitioner's NRE was $617,524.
Petitioner determined that the NRE of the options for 1997
through 2003 was approximately $412,000.  Both of these figures
are considerably more than $125,000.

Because an OIC for $125,000 was less than the RCP, an OIC
for $125,000 would be unacceptable under the Commissioner's
                                        (continued...)

688, 696 (7th Cir. 2006) (stating that "Without an actual offer in compromise to consider, it would be most difficult for either the Tax Court or this court to conclude that the appeals officer might have abused his discretion"); Kendricks v. Commissioner, 124 T.C. 69, 79 (2005) (holding that because "there was no offer in compromise before Appeals, there was no abuse of discretion in Appeals' failing to consider an offer in compromise"); Huntress v. Commissioner, T.C. Memo. 2009-161 (citing Nelson v. Commissioner, T.C. Memo. 2009-108, which held that Appeals did not abuse its discretion in sustaining a lien when a taxpayer requested an OIC generally but had not prepared one); Williams v. Commissioner, T.C. Memo. 2009-159.

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

---

⁶(...continued)
procedures and it would not have been an abuse of discretion to reject such an OIC. See Murphy v. Commissioner, supra at 321; Lemann v. Commissioner, supra; see also McClanahan v. Commissioner, T.C. Memo. 2008-161. When a settlement officer has followed the Commissioner's guidelines to ascertain a taxpayer's RCP and rejected the taxpayer's collection alternative on that basis, we have found no abuse of discretion. Lemann v. Commissioner, supra (and cases cited therein). Furthermore, it is not an abuse of discretion to reject an OIC that bears no relationship to a taxpayer's ability to pay according to his own calculations. Hubbart v. Commissioner, T.C. Memo. 2007-26, affd. in part and vacated in part sub nom. Keller v. Commissioner, 568 F.3d 710 (9th Cir. 2009); Hawkins v. Commissioner, T.C. Memo. 2005-88.

To reflect the foregoing,

                              <u>Decision will be entered</u>

<u>for respondent</u>.